NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230249-U

NO. 4-23-0249

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 18, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ROBERT PEACOCK, as Executor of the Estate of Ruth Maxine Peacock, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant, | ) | Brown County |
| v. | ) | No. 17P4 |
| MARGARET SCRANTON, | ) | |
| Defendant-Appellee. | ) ) ) ) | Honorable Robert K. Adrian, Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Zenoff and Doherty concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) The trial court's determination that (a) checks written to cash by the agent under a power of attorney and (b) checks signed by the principal to the agent and her family as gifts were not fraudulent was not against the manifest weight of the evidence and (2) the court did not abuse its discretion in awarding attorney fees based on a contingency-fee agreement instead of the attorney's hourly rate.

¶ 2     In November 2010, decedent, Ruth Maxine Peacock, executed a power of attorney, naming her niece, defendant Margaret Scranton, as her agent. Plaintiff, Robert Peacock, Ruth's son and executor of her estate, was present. Between that time and Ruth's death in May 2015, Ruth signed checks as gifts to Scranton and her family totaling $52,000. Scranton signed checks as gifts to herself and her family totaling $38,000. Scranton also signed checks made out to cash totaling $22,000.

¶ 3     In January 2017, Robert filed a petition seeking to recover assets, which was later amended several times. Ultimately, in an amended complaint, Robert alleged Scranton breached

her fiduciary duty by writing fraudulent checks to benefit her own interests, and he sought to recover the value of those assets on behalf of the estate.

¶ 4 After a lengthy period of litigation followed by a bench trial, the trial court found Scranton liable for the checks she signed consisting of gifts to herself and her family. However, as to the other checks, the court found them not fraudulent, observing Ruth was competent to write the checks she personally signed, and the checks written to cash were for Ruth's use for everyday financial transactions and to pay a caregiver. Robert sought attorney fees and costs in the amount of $97,639.25 based on his attorney's hourly rate. However, the court, noting the existence of a contingency-fee arrangement, awarded $19,842.33 in fees, representing one-third of the total award to the estate, and $828.50 in costs.

¶ 5 On appeal, Robert contends the trial court erred in determining the checks signed by Ruth and the checks written to cash were proper and in failing to award fees based on his attorney's hourly rate. We affirm.

¶ 6 I. BACKGROUND

¶ 7 In November 2010, Ruth executed a power of attorney naming Scranton as her agent. Ruth died on May 31, 2015. Her will named Robert as executor of her estate and divided the estate equally between Robert and Scranton.

¶ 8 On November 2, 2017, Robert filed an amended complaint seeking to recover assets he alleged Scranton fraudulently obtained using the power of attorney, including checks signed by Ruth as gifts to Scranton and her family, checks signed by Scranton as gifts to herself and her family, and checks signed by Scranton for cash. Judge Amy C. Lannerd initially presided over the proceedings. However, Judge Robert K. Adrian presided over the bench trial and the attorney fee proceedings.

¶ 9          In September 2018, Robert moved for summary judgment, arguing the checks were written for Scranton's benefit and were presumed fraudulent. Scranton responded with evidence Ruth routinely provided gifts to family members and was competent to do so. She also provided evidence Ruth routinely paid cash for daily expenses and to pay a caregiver. The trial court denied the motion, finding a presumption of fraud arose, but Scranton presented evidence rebutting the presumption. Thus, the court found there was a genuine dispute as to material facts.

¶ 10          In July 2022, a bench trial was held. Evidence at trial showed, when the power of attorney was arranged, Ruth, Robert, and Scranton were all named as signatories on Ruth's checking account. Scranton assisted Ruth with her finances and arranged for her personal care. The power of attorney granted Scranton the power to make financial transactions. It did not authorize Scranton to make gifts, and a section that would have allowed for additions to her powers, including the power to make gifts, stated there were no additions.

¶ 11          Robert testified he approved of the use of a power of attorney for Scranton to assist Ruth with her finances. Robert stated Scranton handled everything with the finances because he did not have time due to his work. Between the date of the execution of the power of attorney and Ruth's death, Robert usually called Ruth once per week and often visited on Sundays. They did not discuss her finances. After Ruth's death, Robert discovered he was no longer named on Ruth's checking account and could not gain access to it. When he inquired with Scranton, she said Ruth wanted him removed from the account. She also said Ruth did not have much money. After Robert filed suit, he discovered Ruth had investment accounts of which he had not been aware.

¶ 12        Robert also discovered checks made out to Scranton and members of her family while Scranton was the named power of attorney. While various numbers appear in the record, on appeal, the parties do not dispute that checks totaling $52,000 were signed by Ruth and given to Scranton and her family members as gifts. However, it appeared Scranton prepared the information on the checks. That total also included a check made out to the Brown County Historical Society, an organization Robert testified Scranton was very involved with. Checks totaling $38,000 written as gifts were signed by Scranton. Robert also found checks totaling $22,000 signed by Scranton made out to cash. Robert identified three checks written in 2010 and 2011 totaling $425 as Christmas gifts to him and his family. Ruth also gifted him $30,000 in 1999 for three special needs children he and his wife adopted. She also wrote a check to Robert for $3000 on another occasion, but he could not recall why.

¶ 13        Robert testified about an incident in 2010, shortly after the power of attorney was executed, during which Scranton asked him what they should do about Christmas gifts because Ruth did not have much money. Robert told her his family did not need gifts. He also recounted an incident after Ruth's death during which Scranton suggested leaving the grandchildren out of Ruth's obituary because Ruth did not have much money. The record indicates the grandchildren were included in the obituary but not individually named. On cross-examination, Robert admitted he did not discuss finances with Ruth and was not aware of the charities to which Ruth gave donations. He also admitted he did not perform tasks for Ruth or assist with her personal care during the time Scranton was Ruth's agent under the power of attorney.

¶ 14        One of Ruth's caregivers, Linda Hill, testified she worked as a certified nursing assistant for Ruth from 2010 until Ruth's death. Linda said Ruth confided in her and once or twice a month would be upset about something. For example, Ruth complained about only

having sandwiches in the refrigerator but would not stand up to Scranton about it. Hill testified money for other food such as pizza had been removed. Ruth also ate the same thing for breakfast every day. Hill felt there should be more food choices for Ruth, but she admitted there were meals from Meals on Wheels, a food assistance program, in the freezer. Hill testified there was also a brush and mirror Scranton wanted but Ruth did not want her to have it. Hill was also aware of other disagreements between Ruth and Scranton but did not know the details of them. Sometimes Ruth would cry and tell Hill she was "stuck," but she would not further explain what she meant by that. Hill testified Ruth was depressed shortly before her death and had started to refuse to eat. She also stopped engaging with Hill during that time.

¶ 15        Hill testified she asked Scranton for a commode to be placed by Ruth's bed because it was difficult to get Ruth to the bathroom at night, but Scranton denied that request. Hill thought that was probably because Scranton wanted Ruth to keep walking as long as possible. After Hill told another caregiver she was going to quit over the incident, a commode was put by the bed at night. Hill also testified Ruth had trouble staying warm, but Scranton did not want extra blankets placed on Ruth and told Hill not to do so. Hill stated Scranton and her husband could be very nice but said they were also degrading at times. Hill indicated Scranton and her husband were wrongly critical of her work and accused her of things such as improper parking and using too much toilet paper. On cross-examination, Hill admitted she did not address many of her concerns with Scranton, indicating she felt powerless to do so. She also admitted she did not think Ruth was afraid of Scranton. She said Ruth was afraid of Scranton's husband after he became angry with her about an issue concerning medication, but Ruth also told Hill that Scranton and her husband had been good to her. Hill testified Robert visited Ruth once every two or three months.

¶ 16        Sheryl White, a certified nursing assistant, testified she was employed to assist with Ruth's personal care, but because White had suffered several strokes, she could not remember the dates or some of the details about her care of Ruth. At one point in her testimony, she stated she thought she was a poor witness. White mostly worked nights and helped Ruth get to bed and helped with breakfast in the morning. She did not remember Ruth having a problem with being cold. During that time, White often played a card game with Ruth called Taboo, but Ruth did not play it correctly or understand the rules of the game. The game involved guessing the opponent's card, and Ruth always picked the same one, so White was able to always know the answer. The trial court asked White about Ruth's mental condition, and White stated, "She seemed pretty with it when I was with her." White stated Scranton paid her by check for Ruth's care.

¶ 17        Another caregiver, Beverly Woodworth, testified she provided overnight care for Ruth from February 2014 until her death. During that time, they had rational conversations and Ruth looked at the local paper. Ruth did not complain about being cold or needing blankets and did not complain about Scranton. Ruth also never complained about food. Woodworth said the food necessary to prepare breakfast was always there and indicated Ruth preferred to eat the same thing every morning. Woodworth was often paid in cash.

¶ 18        Nancy Mitchell, a person employed to help Ruth with errands from 2008 until her death, testified Scranton always had Ruth's best interests at heart and would do anything to make sure she was comfortable and cared for. Mitchell said Ruth played Scrabble very well until close to the time of her death. She described her as mentally sharp and said she read the newspaper and worked on puzzle books. Ruth made positive comments about Scranton and said she was happy Scranton was helping her. Ruth never complained about being cold or asked for blankets.

Mitchell said there was always a variety of food in the house. Ruth sometimes gave Mitchell cash to buy items and sometimes wrote checks.

¶ 19     Scranton testified about her relationship with Ruth, including how over the years they shared an interest in teaching and attended professional meetings and church together. They also spent evenings together and went out to eat together. Ruth considered Scranton's children as her grandchildren and babysat them. She also took an interest in their education and attended their activities and sports. Scranton's family took trips with Ruth. Scranton described Ruth as a voracious reader, a musician, and someone who loved puzzles. Scranton testified her family almost always celebrated Christmas with Ruth.

¶ 20     Scranton testified Robert left home and lived with his uncle beginning in eighth grade and never again stayed at his parent's house. Scranton said it "crushed" Ruth and her husband. Scranton testified Robert once told her, "[Y]ou take care of [Ruth] while she's alive, and I'll take care of her *** when she's dead." She said Robert usually took his family skiing or to the beach for Christmas. One time, when he was not going to be gone, Scranton asked him to stay with Ruth on Christmas afternoon and evening so Scranton could go see her grandchildren in St. Louis, and Robert told her, "[G]et one of your women to do it."

¶ 21     Scranton testified she assisted Ruth with things such as errands, grocery shopping, medical appointments, laundry, housework, and personal care. She was not paid for that assistance. Her children had also assisted Ruth. Ruth was very self-sufficient for some time but eventually needed additional care. Scranton then hired Ruth's caregivers. She also arranged for Meals on Wheels. Ruth provided a grocery list for other items. Scranton indicated there was a variety of food in the home for Ruth.

¶ 22    Scranton assisted Ruth with her finances, including helping her set up investments. She said she offered to share information about the finances with Robert, but he was not interested in looking at it. Scranton started writing checks for Ruth when Ruth no longer wanted to do it herself. Scranton said she followed Ruth's established habit of paying for many things in cash. Initially, Scranton wrote checks for cash for $200 or $300 each month. Scranton would get the cash in $20 denominations and give it to Ruth. When Woodworth was hired, she asked to be paid in cash, and Scranton then wrote checks for around $2000 per month for cash. All of the cash was always spent for Ruth's needs. When Ruth died, Scranton split the cash that was in Ruth's home between herself and Robert. Scranton took care of cleaning the house and selling it after Ruth's death.

¶ 23    Scranton testified Ruth had a history of giving gifts to herself and her family. After December 2014, Ruth did not ask Scranton to write any more gift checks. Scranton denied ever telling Robert that Ruth lacked money for Christmas gifts. Instead, Scranton said she told Robert that Ruth had directed her to make out checks as gifts to her and her family. Scranton said Robert replied not to worry about writing checks to his kids because they would just waste it. Scranton stated that, sometime after she became Ruth's agent, the bank changed checking account systems and required new signature cards. Ruth then decided to convert the account to a joint account with Scranton, as Scranton and Robert were only signatories on the previous account. Scranton testified the investment accounts were transferrable upon death and were paid out to her and Robert equally shortly after Ruth's death.

¶ 24    Scranton's husband testified and generally corroborated Scranton's testimony. He further testified about Ruth's finances and unpaid work he did for Ruth. Scranton's daughter also testified and generally corroborated Scranton's testimony. She also stated Ruth gifted

money to her throughout her life and gifted money to her parents to help pay for her college education. Scranton's son also testified about gifts from Ruth. James Fisher, Ruth's financial advisor, testified about her investments and stated the funds from her investments were distributed shortly after her death.

¶ 25 The trial court entered a written order finding Scranton accounted for the checks written to cash. The court found Ruth used cash for everyday financial transactions and noted the amount used was consistent through the years except during the period when one of the caregivers was paid in cash. At that time a larger amount was used to cover that expense.

¶ 26 As to the checks written as gifts that were signed by Ruth, the trial court found the act of giving a power of attorney to someone did not terminate the principal's power to issue her own checks and make gifts. The court found Ruth was competent until the end of her life and noted the last of the checks issued as gifts was almost two years before her death.

¶ 27 The trial court found Scranton liable for the checks written as gifts that Scranton signed because the power of attorney specifically provided that she was not given the power to make gifts. Thus, the court required Scranton to reimburse the estate the present value of the $38,000 in checks. The court continued the matter for a determination of the issue of the present value of that amount and attorney fees.

¶ 28 Robert sought $97,639.25 in attorney fees based on evidence of his attorney's hourly rate. Robert initially agreed to pay hourly for legal services. However, he later entered into an amended contract for legal services stating he would pay one-third of any sum recovered from Scranton. The agreement also provided counsel would charge for services only in accordance with the agreement. The record shows a hearing was held on the matter, but there is no transcript of the hearing or substitute for a transcript in the record.

¶ 29        The trial court entered a written order finding the present value of the checks written as gifts and signed by Scranton was $59,527. The court noted it was not the original judge on the case but found there was no reason for the case to have taken five years to go to trial. The court stated an award of fees on an hourly basis would result in fees well over the amount of the judgment entered. The court found the contingency-fee contract reasonable and awarded fees based on the contract in the amount of $19,842.33 plus costs of $828.50.

¶ 30        This appeal followed.

¶ 31                              II. ANALYSIS

¶ 32        On appeal, Robert contends the trial court erred in (1) determining the checks signed by Ruth and the checks written to cash were proper and (2) failing to award fees based on his attorney's hourly rate.

¶ 33                 A. Checks Signed by Ruth or Written to Cash

¶ 34        Robert first contends the trial court erred when it determined the checks signed by Ruth and the checks made out to cash were not fraudulent.

¶ 35        Under section 2-7(a) of the Illinois Power of Attorney Act (Act) (755 ILCS 45/2-7(a) (West 2022)), "[t]he agent shall be under no duty to exercise the powers granted by the agency or to assume control of or responsibility for any of the principal's property, care or affairs, regardless of the principal's physical or mental condition." However, "[w]henever a power is exercised, the agent shall act in good faith for the benefit of the principal using due care, competence, and diligence in accordance with the terms of the agency and shall be liable for negligent exercise." 755 ILCS 45/2-7(a) (West 2022). In addition, "[a]n agent who acts with due care for the benefit of the principal shall not be liable or limited merely because the agent also benefits from the act, has individual or conflicting interests in relation to the property, care

- 10 -

or affairs of the principal or acts in a different manner with respect to the agency and the agent's individual interests." 755 ILCS 45/2-7(a) (West 2022).

¶ 36        "A power of attorney creates a fiduciary relationship as a matter of law." *Collins v. Noltensmeier*, 2018 IL App (4th) 170443, ¶ 25, 103 N.E.3d 495 (citing *In re Estate of Shelton*, 2017 IL 121199, ¶ 22, 89 N.E.3d 391; 755 ILCS 45/2-7(a), (b) (West 2010)). "The mere existence of a fiduciary relationship prohibits the agent from seeking or obtaining any selfish benefit for herself; if the agent seeks or obtains such benefit, the transaction is presumed to be fraudulent." *Collins*, 2018 IL App (4th) 170443, ¶ 25 (citing *Estate of Shelton*, 2017 IL 121199, ¶ 22). " 'Thus, any conveyance of the principal's property that either materially benefits the agent or is for the agent's own use is presumed to be fraudulent.' " *Collins*, 2018 IL App (4th) 170443, ¶ 25 (quoting *Spring Valley Nursing Center, L.P. v. Allen*, 2012 IL App (3d) 110915, ¶ 12, 977 N.E.2d 1230). The agent's duty is not limited only to transactions invoking the power of attorney. *In re Guardianship of Spinnie*, 2016 IL App (5th) 150564, ¶ 26, 65 N.E. 3d 541.

¶ 37        Once a fraudulent transaction has been alleged, the burden shifts to the agent to prove by clear and convincing evidence the transaction was fair and did not result from undue influence by the agent over the principal. *Collins*, 2018 IL App (4th) 170443, ¶ 25. "In other words, the presumption of fraud is rebuttable if it can be shown that the agent exercised good faith and did not betray the confidence placed in her." *Collins*, 2018 IL App (4th) 170443, ¶ 26. "If the agent rebuts the presumption of fraud, the transaction in question will be upheld." *Collins*, 2018 IL App (4th) 170443, ¶ 26 (citing 755 ILCS 45/2- 7(a) (West 2010) (agent who acts with due care for the benefit of the principal will not be held liable merely because the act also benefits the agent)).

¶ 38    When a conveyance is not procured through improper means attended with circumstances of oppression or overreaching but was entered into by the principal with full knowledge of its nature and effect and because of his or her deliberate, voluntary, and intelligent desire, the existence of a fiduciary relation does not invalidate the transaction. See *Collins*, 2018 IL App (4th) 170443, ¶ 26 (citing *Clark v. Clark*, 398 Ill. 592, 602, 76 N.E.2d 446, 451 (1947)). "Some of the significant factors to be considered in determining if the presumption of fraud has been rebutted include whether the fiduciary made a frank disclosure to the principal of the information he had, whether the fiduciary paid adequate consideration, and whether the principal had competent and independent advice." *Spring Valley Nursing Center*, 2012 IL App (3d) 110915, ¶ 13.

¶ 39    "A trial court's determination as to whether a presumption of fraud has been overcome, made after an evidentiary hearing, is entitled to deference and will not be reversed on appeal unless it is against the manifest weight of the evidence." *Spring Valley Nursing Center*, 2012 IL App (3d) 110915, ¶ 14. "A ruling is against the manifest weight of the evidence only if it is clearly evident from the record that the opposite conclusion should have been reached or if the ruling itself is arbitrary, unreasonable, or not based on the evidence presented." *Spring Valley Nursing Center*, 2012 IL App (3d) 110915, ¶ 14.

¶ 40    Here, Robert argues Scranton had a fiduciary duty under the Act to prevent actions that would disrupt or damage the amount of Ruth's estate. However, the Act itself clearly states "[t]he agent shall be under no duty to exercise the powers granted by the agency or to assume control of or responsibility for any of the principal's property, care or affairs, regardless of the principal's physical or mental condition." 755 ILCS 45/2-7(a) (West 2022). Thus, Scranton had no duty to prevent Ruth from spending her money as she saw fit. However,

the existence of Scranton's fiduciary relationship did prohibit her from using undue influence to seek or obtain any selfish benefit for herself, giving rise to the presumption that transactions benefiting her were fraudulent. *Guardianship of Spinnie*, 2016 IL App (5th) 150564, ¶ 26. Thus, Scranton was required to show she exercised good faith and did not betray the confidence placed in her. *Guardianship of Spinnie*, 2016 IL App (5th) 150564, ¶ 27.

¶ 41 In that regard, the trial court's determination that the gifts were not improper was not against the manifest weight of the evidence as there was sufficient evidence to rebut the presumption of fraud. Although Scranton filled out information on the checks, Ruth signed them. That alone is compelling evidence it was Ruth's decision, not Scranton's, to make the financial transactions. Ample evidence was presented to show Ruth was competent, and, as the court noted, nothing in the Act or in the power of attorney terminated Ruth's power to govern her own finances.

¶ 42 Robert points to evidence regarding Ruth's declining health, the amount of the gifts, and evidence indicating Scranton mistreated Ruth or had disagreements with Ruth to suggest Ruth was not competent or the gifts were not legitimate. However, Scranton presented significant evidence to the contrary. In particular, she presented evidence of a long history of gifts from Ruth to Scranton and her family based on their close relationships. Ruth also gave gifts to Robert's family. Further, as previously noted, there was strong evidence of Ruth's competency. Given Ruth's competence, evidence of her close relationship with Scranton, and the significant amount of unpaid personal care Scranton and her family provided to Ruth, any suggestion Scranton coerced Ruth into signing the checks was not well supported and contradicted by Scranton's evidence. Thus, the presumption of fraud was overcome by clear and convincing evidence that the transactions made personally by Ruth were fair and equitable and

were not a result of undue influence. See *Guardianship of Spinnie*, 2016 IL App (5th) 150564, ¶¶ 27- 28 (strength of evidence supporting presumption of fraud was "tenuous" and the presumption was rebutted when the principle was competent, expressed a desire to gift, consistently signed checks in her own capacity, and there was a lack of evidence of undue influence). Accordingly, the trial court's factual determination of the issue was not against the manifest weight of the evidence.

¶ 43 As to the checks written to cash, any presumption of fraud that may have arisen from them was adequately rebutted. Scranton presented evidence that Ruth routinely used cash for everyday financial transactions and, for a period of time, paid a caregiver in cash. She also accounted for checks that were reimbursements to her for money she spent for Ruth. Overall, there was a lack of evidence the checks made out to cash were made for Scranton's benefit. Accordingly, the trial court's determination that the checks were legitimate was not against the manifest weight of the evidence.

¶ 44 B. Attorney Fees

¶ 45 Robert next contends the trial court erred by failing to award attorney fees based on his attorney's hourly fees. He argues the Act requires the fees to be based on the hourly rate despite the existence of a contingency-fee agreement.

¶ 46 The general rule is that parties in a lawsuit are responsible for their own attorney fees. See *Myers v. Popp Enterprises, Inc.*, 216 Ill. App. 3d 830, 838, 576 N.E.2d 452, 457 (1991). However, a court may award attorney fees if they are expressly authorized by statute or by agreement of the parties. *In re Marriage of Magnuson*, 156 Ill. App. 3d 691, 700, 510 N.E.2d 437, 443 (1987).

¶ 47 Section 2-7(f) of the Act provides:

"An agent that violates this Act is liable to the principal or the principal's successors in interest for the amount required (i) to restore the value of the principal's property to what it would have been had the violation not occurred, and (ii) to reimburse the principal or the principal's successors in interest for the attorney's fees and costs paid on the agent's behalf. This subsection does not limit any other applicable legal or equitable remedies." 755 ILCS 45/2-7(f) (West 2022).

¶ 48 "The legislative intent behind this section of the Act suggests that attorney fees should be awarded whenever a violation of the Act is proved in order to make the principal's estate whole." *Collins*, 2018 IL App (4th) 170443, ¶ 39. In cases involving an award of attorney fees, only those fees that are reasonable will be allowed. See *LaHood v. Couri*, 236 Ill. App. 3d 641, 648, 603 N.E.2d 1165 (1992). " 'This court has held that, for purposes of determining statutory attorney fees, the term 'reasonable' applies regardless of the nature of the client's contractual relationship with his attorney.' " *Collins*, 2018 IL App (4th) 170443, ¶ 41 (quoting *Blankenship v. Dialist International Corp.*, 209 Ill. App. 3d 920, 927, 568 N.E.2d 503, 506 (1991)).

¶ 49 " '[A]n attorney fee award cannot be based solely on an amount necessary to satisfy a contingent fee agreement existing between an attorney and a client,' " as the unsuccessful party is not a party to that agreement. *Collins*, 2018 IL App (4th) 170443, ¶ 42 (quoting *Collins v. Hurst*, 316 Ill. App. 3d 171, 173, 736 N.E.2d 600, 603 (2000)). However, "[t]he existence of a contingent fee contract is a relevant factor to be considered in determining the reasonableness of attorney fees." *Collins*, 2018 IL App (4th) 170443, ¶ 39 (citing *Berlak v.*

*Villa Scalabrini Home for the Aged, Inc.*, 284 Ill. App. 3d 231, 240, 671 N.E.2d 768, 774 (1996)).

¶ 50        "The trial court's decision in awarding statutory attorney fees will not be reversed absent an abuse of discretion." *Collins*, 2018 IL App (4th) 170443, ¶ 41. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41, 39 N.E.3d 961.

¶ 51        Here, Robert suggests the Act requires a fee award based on his attorney's hourly rate and argues this court should essentially ignore the standard of review applicable to the trial court's factual findings. However, while the Act does not require the trial court to apply the contingent fee, the law allows the court to consider it. Further, the law is clear that Robert cannot recover fees that are unreasonable. The court correctly applied the Act and considered whether the amount Robert sought in fees was reasonable. Thus, we review the court's determination as to the reasonableness of the fee award for an abuse of discretion.

¶ 52        Here, the trial court noted factors showing the hourly fee was not reasonable. The court specifically noted what it viewed to be unnecessary litigation. It further noted a fee based on the hourly rate would be grossly out of proportion to the total recovery. We also observe that, under the contingency-fee agreement, Robert's attorney agreed to not charge him more than one-third of the recovery. Thus, a greater award is unnecessary to reimburse the estate for its fees and costs. See *Collins*, 2018 IL App (4th) 170443, ¶ 43 (finding the trial court did not abuse its discretion in finding a contingency-fee agreement reasonable). We further note, because there is no report of proceedings or acceptable substitute of the hearing held on the issue of fees, there is also no basis for holding the court abused its discretion. See *Foutch v. O'Bryant*, 99 Ill. 2d 389,

- 16 -

392, 459 N.E.2d 958, 959 (1984). Given those factors, the court's determination to award the amount of the contingent fee was not an abuse of discretion.

¶ 53                                III. CONCLUSION

¶ 54        For the reasons stated, the trial court's judgment is affirmed.

¶ 55        Affirmed.